# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 24-24340-CIV-ALTONAGA/Reid

**ISRAEL BASSAT**,

      Petitioner,

v.

**SAPIR SWISSA DANA**,

      Respondent.

_____/

## <u>ORDER</u>

**THIS CAUSE** came before the Court on Petitioner, Israel Bassat's Verified Petition for Return of Child[ren] [ECF No. 1], filed on November 5, 2024.  The Court held an initial hearing on November 13, 2024 (*see* Nov. 13, 2024 Hr'g [ECF No. 7]); followed by an evidentiary hearing drawn out over two weeks, during which Petitioner; Respondent, Sapir Swissa Dana; the parties' two minor children; and several family members testified (*see* Jan. 13, 2025 Hr'g [ECF No. 49]; Jan. 14, 2025 Hr'g [ECF No. 50]; Feb. 3, 2025 Hr'g [ECF No. 61]; Feb. 5, 2025 Hr'g [ECF No. 62]).[1]  After the final day of the hearing, the parties provided supplemental briefing at the Court's request.  (*See* Feb. 13, 2025 Order [ECF No. 63]; Pet'r's Suppl. Mem. of Law ("Pet'r's Mem.") [ECF No. 68]; Resp't's Suppl. Mem. of Law ("Resp't's Mem.") [ECF No. 69]).  Having carefully considered the record and evidence presented, arguments from counsel, the parties' written submissions, and applicable law, the Court grants the Petition.

---

[1] A petition of this nature is typically resolved expeditiously — within six weeks of its filing.  *See Chafin v. Chafin*, 742 F.3d 934, 936–37 (11th Cir. 2013); S.D. Fla. Internal Operating Proc. § 2.18.00.  Here, after the Court initially scheduled the evidentiary hearing on the Petition for December 9, 2024 [ECF No. 8], the parties twice sought continuances (*see* Motions [ECF Nos. 19, 28]).

## I.      INTRODUCTION

"While child custody battles are all too common, it is not often that one of them finds its way into the federal courts." *Pielage v. McConnell*, 516 F.3d 1282, 1283 (11th Cir. 2008).  This one did.  Petitioner invokes the Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980 ("Hague Convention" or "Convention") and its corresponding U.S. statute, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.*; and seeks an order directing the return of the parties' two minor children, A.B. and G.B. (the "Children") to Israel.  (*See* Pet. ¶¶ 1–2).[2]

The Hague Convention is meant to protect children from both wrongful removals and wrongful retentions by a parent.  *See* Hague Convention, Preamble.  It was created "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access[.]" *Id.* (alteration added).  This case involves an alleged wrongful retention of the children by their mother, not removal.  (*See* Pet. ¶ 49).  Respondent denies the claim of wrongful retention, contends that Petitioner did not possess or exercise custody rights over the children, and raises several affirmative defenses.  (*See generally* Resp't's Answer & Aff. Defenses ("Ans.") [ECF No. 26]).

The Convention is designed to "'restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.'" *Lops v. Lops*, 140 F.3d 927, 936 (11th Cir. 1998) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996)).  "The

---

[2] "The United States and Israel are both signatories to the Hague Convention." *Bekier v. Bekier*, 248 F.3d 1051, 1052 n.1 (11th Cir. 2001) (citation omitted), *abrogated on other grounds by Chafin v. Chafin*, 568 U.S. 165 (2013).

underlying premise of the Hague Convention is that a child's country of 'habitual residence' is the place where questions of custody and access are best decided." *Bocquet v. Ouzid*, 225 F. Supp. 2d 1337, 1340 (S.D. Fla. 2002) (citations omitted). Therefore, a court considering an ICARA petition has jurisdiction over the wrongful removal or retention claim but not the underlying custody dispute. *See Lops*, 140 F.3d at 936.

To establish a *prima facie* case of wrongful retention under the Hague Convention, a petitioner must show by a preponderance of the evidence that: (1) at the time of the alleged wrongful retention, the child in question was a habitual resident of a foreign country; (2) the retention breached the petitioner's custody rights under that foreign country's law; and (3) the petitioner was actually exercising those custody rights when the wrongful retention occurred. *See Calixto v. Lesmes*, 909 F.3d 1079, 1084 (11th Cir. 2018) (citations omitted).

A respondent who objects to the child's return may establish one (or more) of five affirmative defenses, each of which is narrowly construed:

> 1) the child is now settled in the new environment; 2) the person in the care of the child was not actually exercising custody rights at the time of removal, or subsequently consented to or acquiesced in the removal; 3) the child objects to the return and is mature enough to have their [sic] objection considered; 4) there is a grave risk that return would expose the child to physical or psychological harm or otherwise intolerable situation; or 5) the return of the child would not be permitted under the fundamental principles of the requested state relating to the protection of human rights and fundamental freedoms.

*Crespo Rivero v. Carolina Godoy*, No. 18-23087-Civ, 2018 WL 7577757, at *2 (S.D. Fla. Oct. 12, 2018) (citations and footnote call number omitted). The first three affirmative defenses require proof by a preponderance of the evidence; the last two require clear and convincing evidence. *See id.* at *2 n.1; *see also* 22 U.S.C. §§ 9003(e)(2)(A)–(B).

Here, Respondent's affirmative defenses encompass four of the five available under the Convention as well as challenge Petitioner's *prima facie* case: (1) Petitioner "fails to state a claim

upon which relief can be granted"; (2) Respondent did not breach Petitioner's custody rights because he "has no custody rights" under Israeli law, and because the parties made an agreement that authorized Respondent to retain the Children outside of Israel; (3) relatedly, Petitioner "consented or acquiesced" to the retention; (4) the "war in Israel" poses a grave risk of harm to the Children; (5) Petitioner poses a grave risk of harm to the Children; (6) repatriation would be inconsistent with fundamental principles of the United States, given the "war conditions in Israel" and "Petitioner's conduct and lifestyle"; and (7) the Children object to repatriation and are mature enough for the Court to consider their views. (Ans. 22–23).[3, 4]

## II. FINDINGS OF FACT

For clarity, the Court separates the following discussion into facts related primarily to Petitioner's *prima facie* case and facts related to Respondent's affirmative defenses. Some facts are relevant to both, particularly because several of Respondent's defenses challenge Petitioner's *prima facie* case.

### A. Facts Related to Petitioner's *Prima Facie* Case of Wrongful Retention

***Petitioner's Role in the Children's Lives.*** Petitioner and Respondent married in Dimona, Israel in 2015 and have two children together, A.B., born on June 15, 2015; and G.B., born on July 11, 2016. The Children and both parties are Israeli citizens. Respondent also has U.S. citizenship.

The Children lived together with Petitioner and Respondent in Israel — first in Holon, then in Dimona — until 2019, when Petitioner and Respondent divorced. After the divorce, Respondent

---

[3] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

[4] Respondent also asserted the affirmative defense that Israel was not the Children's habitual residence (*see* Ans. 22), before stipulating to habitual residence during the February 14, 2025 evidentiary hearing.

moved back to Holon and took the Children with her — over Petitioner's objection.  Petitioner

remained in Dimona, where he remarried.  As part of the divorce judgment, an Israeli family court

awarded Petitioner visitation rights to the Children and ordered him to pay child support.

In 2020, Petitioner began serving a 20-month prison sentence.  After his release, he

exercised his visitation rights on some occasions.  The parties' testimony referenced visits that

Petitioner had with the Children after the divorce.  Several times, Respondent left the Children

with Petitioner and their stepmother for extended stays while she visited her mother in Hollywood,

Florida.

Despite these visits, the parties dispute the extent of Petitioner's involvement in the

Children's lives after 2020.  Respondent testified at length about how Petitioner was out of touch

with the Children — failing to comply with the Israeli family court's visitation schedule and rarely

calling, both before and after the Children left Israel.  The Children's *in camera* testimony[5] echoed

this account: both A.B. and G.B. described distant relationships with Petitioner, recalled specific

instances where he declined to see them, and recounted one occasion where Petitioner refused to

open the door on G.B.'s birthday after the Children traveled to Dimona to see him.

According to Petitioner, he visited the Children often and made repeated efforts to call

them.  He also claims that after leaving Israel, Respondent blocked him on WhatsApp.  Respondent

concedes she did, but claims Petitioner had other means of contacting the Children, including a

dedicated phone number he failed to use.

The Court finds the testimony of Respondent and the Children persuasive.  That said, the

---

[5] During the January 14, 2025 evidentiary hearing, the Court interviewed A.B. and G.B. in chambers using
questions the parties supplied in advance.  The parties heard the Children's testimony via a simultaneous
audio feed in the courtroom.

Court does not resolve the dispute about how involved Petitioner has been in the Children's lives. As explained below, doing so is unnecessary to assess whether Petitioner meets his *prima facie* case.

***The Parties' January 2023 Agreement.*** By January 2023, Petitioner had fallen behind in his child-support payments. Respondent initiated collection proceedings, and on January 9, 2023, the parties reached a court-approved agreement.

Respondent agreed to stay the collection efforts, and in return, Petitioner consented to allow her to travel abroad with the Children under certain conditions. (*See* Pet'r's Ex. List [ECF No. 66], Ex. 5, Urgent Mot. by Beneficiary . . . ("Jan. 2023 Agreement") [ECF No. 66-5] 6–7). Specifically, Petitioner gave Respondent permission to take the Children abroad for 60 days, for any reason. (*See id.* 7). Respondent could extend the 60-day period "according to the coordination between the [p]arties and/or limitations unrelated to [Respondent], e.g., strikes, C[OVID]-related restrictions, etc." (*Id.* (alterations added)).[6] This last clause has become central to the parties' Hague Petition dispute.

***Respondent Brings the Children to Florida.*** On October 7, 2023, Israel was brutally attacked, and the country found itself at war. Respondent flew with the Children — and with her two younger children, twin two-year-olds — from Tel Aviv, Israel to Miami, Florida on November 9, 2023. (*See* Resp't's Ex. List [ECF No. 65], Ex. 11, Flight Tickets [ECF No. 65-8] 5). The State of Florida paid for the flights as part of an initiative to assist Israelis after the October 7 attack, and the Greater Miami Jewish Federation provided Respondent with relocation-related financial assistance. (*See generally id.*, Ex. 12, Letter [ECF No. 65-9]). Respondent and the Children stayed

---

[6] This document was translated from the original Hebrew by an interpreter Petitioner hired. Respondent did not object to its admission in evidence.

6

temporarily with Respondent's mother in Hollywood, Florida, before moving into a separate residence nearby.  Respondent now works from home as a travel agent, and the Children attend school in Hollywood.

Initially, Petitioner was in support of the trip, but in late December, he objected when Respondent told him that she planned to keep the Children in Hollywood until at least January 23, 2024 — 76 days after leaving Israel — and possibly longer if the war persisted.  (*See* Pet., Ex. 6 [WhatsApp] [M]essages . . . [ECF No. 1-6] 1).  In April 2024, Respondent had still not returned the Children to Israel.  She informed Petitioner, "there is a war and I don't go back to war[;]" she had "discovered that we have peace of mind and a calm life here[;]" the Children did not want to return to Israel; and the Children were "at an age where they can decide for themselves[.]"  (*Id.* 5 (alterations added)).

Currently, Petitioner cannot travel to the United States.  He lacks a visa and is restricted from holding a passport due to child-support arrears he has accrued since Respondent stayed collection proceedings in 2023.  (*See generally* Pet'r's Ex. List, Ex. 9, Debtor's Travel Restrictions [ECF No. 66-8]).

**B.  Facts Related to Respondent's Affirmative Defenses**

***The Conditions in Israel.***  Much of the testimony focused on present conditions in Israel, which Respondent contends justify her retention of the Children.  The parties agree that Israel was at war in the months following the October 7, 2023 attack and that removing the Children in November 2023 was proper.  Yet, they disagree on whether and to what extent the war is ongoing — and ongoing in Holon and Dimona — and whether those cities are now "safe."  Respondent claims fighting and terrorist attacks are ongoing and that, when she left, she did not anticipate the conflict lasting this long.  Petitioner insists that the situation has stabilized, and Israel is now safe

for the Children's return.

*Petitioner's Violent Conduct and Threats.*   Finally — as relevant to Respondent's argument that Petitioner poses a grave risk of harm to the Children — the parties dispute whether Petitioner physically abused Respondent and her cousin, threatened violence against others, and damaged Respondent's property.   Respondent and G.B. testified that Petitioner physically assaulted Respondent, and Petitioner and his current wife burned Respondent's property. Respondent submitted photographs she claims depict injuries Petitioner inflicted on her in 2019 (*see generally* Resp't's Ex. List, Ex. 32, Photographs [ECF No. 65-11]); damage Petitioner did to her vehicle in 2019 (*see id.*, Ex. 34, Photographs [ECF No. 65-12]; and damage Petitioner did to her family's property in 2018 (*see id.*, Ex. 35, Photographs [ECF No. 65-13]).   Respondent also submitted in evidence a protective order an Israeli family court entered against Petitioner and his current wife in 2019 after finding there was a "reasonable basis to assume that [their behavior] put[] her in real physical danger."[7]

According to Respondent, Petitioner routinely threatened physical harm against people who sought to help her — including one instance when Petitioner warned Respondent's friend he would end up "crippled" and "in a wheelchair" if he let Respondent borrow a car.   Respondent alleged Petitioner threatened her, too, alluding to a Molotov cocktail Petitioner sent to Respondent's home as a "warning."   Further, Respondent's cousin, Chanel Assayag, testified that Petitioner attacked Assayag and threatened to murder her.

Notwithstanding this testimony, neither Respondent nor Assayag suggested Petitioner had physically harmed the Children or that he might do so in the future.   In fact, Respondent stated she

---

[7] Respondent provided the Court with a translated copy of this protective order at the January 13, 2025 hearing, but did not file it on the Court's CM/ECF system.

did *not* fear that Petitioner was "going to do something to the girls." Petitioner denied all allegations of abuse or destruction of property.

## III.    CONCLUSIONS OF LAW

### A. Wrongful Retention

With that, the Court turns to the legal requirements of Petitioner's case. The parties stipulate that Israel was the Children's habitual residence at the time of the alleged wrongful retention; they dispute the remaining elements of the *prima facie* case. The Court finds that Respondent breached Petitioner's custody rights when she retained the Children outside of Israel for over 60 days, and that Petitioner was exercising his custody rights at the time of the breach. Therefore, Petitioner establishes a *prima facie* case of wrongful retention.

***Breach of custody rights.*** The Court first examines whether Petitioner has custody rights under Israeli law. The Hague Convention "defines 'rights of custody' to 'include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence[.]'" *Abbott v. Abbott*, 560 U.S. 1, 9 (2010) (alteration added; quoting Hague Convention, Art. 5(a)). Thus, a parent's right to determine a child's residence — even when exercised jointly — qualifies as a right of custody under the Convention. *See id.* at 11 (citation omitted); *see also Furnes v. Reeves*, 362 F.3d 702, 716 (11th Cir. 2004) (explaining that a parent's joint authority over a child's relocation constitutes "significant decision-making authority over the child's care[,]" (alteration added)), *abrogated on other grounds by Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014); *Berenguela-Alvarado v. Castanos*, 950 F.3d 1352, 1358 (11th Cir. 2020) (holding that a retention is "wrongful" when "it is in breach of rights of custody attributed to a person, . . . either jointly or alone" (alteration in original; quotation marks omitted; quoting Hague Convention, Art. 3)).

Here, Petitioner has proven by a preponderance of the evidence that he has custody rights

to both Children.  Petitioner submitted a declaration from Hagit Oaknin Lessens, an attorney licensed to practice law in the State of Israel; Lessens exclusively practices Israeli family law.  (*See* Pet'r's Ex. List, Ex. 31 [Lessens] Decl. . . . ("Lessens Decl.") [ECF No. 66-31] ¶¶ 1–6).  Lessens affirms that Petitioner is the legal father of both Children.  (*See* Lessens Decl. ¶¶ 8, 12 (citations omitted); *see also* Pet'r's Ex. List, Ex. 2, Birth Certificate of G.B. [ECF No. 66-2] 3; *id.*, Ex. 3, Birth Certificate of A.B. [ECF No. 66-3] 3).  According to Lessens, Petitioner's status as the legal father of A.B. and G.B. gives Petitioner custody rights to both Children under applicable Israeli law (*see* Lessens Decl. ¶¶ 13–18) — including the right to "take care of the needs of" A.B. and G.B., and the right to "determine [each child's] place of residence and the authority to act on [each child's] behalf (*id.* ¶ 18 (alterations added; citation omitted)).  This evidence, which Respondent does not contest, is sufficient to establish Petitioner's custody rights under the Hague Convention. *See id.*, Art. 14 (authorizing courts to take notice of the laws and judicial decisions of foreign countries).

Neither the parties' divorce nor their January 2023 Agreement abrogated Petitioner's custody rights.  After Petitioner and Respondent divorced, an Israeli family court awarded Petitioner visitation rights to the Children and joint authority — alongside Respondent — to determine the Children's place of residence.  (*See* Pet'r's Ex. List, Ex. 19, Custody & Visitation Order [ECF No. 66-33] 8 (noting that Respondent breached Petitioner's custody rights when she unilaterally relocated the Children to Holon); Lessens Decl. ¶¶ 19–20).  The January 2023 Agreement "does not cancel" those rights.  (Jan. 2023 Agreement 5).  While the Agreement allows Respondent to remove the Children from Israel for up to 60 days — and under certain conditions beyond that period — it preserves Petitioner's visitation rights and his joint authority to determine the Children's residence.  (*See id.*).  In short, Petitioner retains his custody rights under the

Convention.  *See Abbott*, 560 U.S. at 9.

Respondent argues that even if Petitioner has custody rights, she did not breach them because the January 2023 Agreement authorized the Children's retention in the United States.  The crux of Respondent's argument is that the conditions in Israel following the October 7, 2023 attack qualify as a "limitation[] unrelated to [Respondent]" under the language of the Agreement, which would permit her to keep the Children here beyond 60 days.  (Jan. 2023 Agreement 5 (alterations added)).  Presumably, indefinitely.  This argument is unpersuasive.[8]

The term "limitation[]" in the Agreement does not encompass Respondent's personal judgment or view that returning the Children to Israel is unsafe.  Courts interpret undefined contract terms based on their "customary and normal meaning." *Mega Life & Health Ins. Co. v. Pieniozek*, 516 F.3d 985, 991 (11th Cir. 2008) (citation and quotation marks omitted). "Limitation" is commonly understood to mean "restriction."  *Limitation*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/limitation (last visited Feb. 26, 2025).  The Agreement itself illustrates this definition, citing examples such as "strikes" and "C[OVID]-19-related restrictions" — situations that physically *restrict* Respondent's ability to return the Children.  (Jan. 2023 Agreement 7 (alteration added)).  Thus, a qualifying limitation under the Agreement is one that impedes or prevents Respondent from returning the Children, not one that merely makes return undesirable according to Respondent.

Certainly, Respondent does not contend she was *restricted* from returning the Children after 60 days in this country — only that she did not *want* to return them due to her perception of

---

[8] The Court need not wade into the parties' dispute over the dangerousness of present-day Israel to decide whether the January 2023 Agreement authorizes Respondent's extended retention of the Children.  Even assuming Israel is as perilous as Respondent maintains, basic principles of contract interpretation — including the absence of any war condition in the Agreement allowing for indefinite relocation from the Children's habitual residence — are fatal to her argument.

the dangers of residing in Israel.  That is not a "limitation[]" under the parties' Agreement.  (Jan. 2023 Agreement 7 (alteration added)).  Moreover, interpreting "limitation" to encompass Respondent's subjective assessment of whether returning the Children is appropriate is at odds with the Agreement's qualifier that the "limitations" are "unrelated to" Respondent.  (*Id.*).[9]  In short, the January 2023 Agreement does not authorize Respondent to retain the Children outside of Israel for over 60 days.

Because Petitioner did not consent to the Children's continued retention, Respondent breached his custody rights when she kept the Children in the United States past the agreed-upon period and in the absence of any of the other contracted-for limitations.

***Actually exercising.***  Next, the Court turns to whether Petitioner "had actually been exercising those custody rights" at the time Respondent breached them.  *Calixto*, 909 F.3d at 1084 (citations omitted).  To establish this element, Petitioner need only show that he "'ke[pt], or [sought] to keep, any sort of regular contact with'" the Children.  *In re S.L.C.*, 4 F. Supp. 3d 1338, 1348 (M.D. Fla. 2014) (alterations added; quoting *Friedrich*, 78 F.3d at 1065).  Petitioner easily clears that hurdle.

While the parties dispute the *extent* to which Petitioner was exercising his custody rights at the time of the retention, both sides acknowledge that he made at least some attempts to call the Children and contributed some child support, despite substantial arrearage.  (*See generally* Pet'r's Ex. List, Child Support Receipts [ECF No. 66-30]).  This level of engagement establishes Petitioner was exercising his custody rights under the Convention; in other words, he did not

_____

[9] Petitioner argues — and the Court agrees — that the phrase "unrelated to [Respondent]" means the "limitations" must be beyond her control, akin to a *force majeure* clause.   (Jan. 2023 Agreement 7 (alteration added)); *see also Stein v. Paradigm Mirasol, LLC*, 586 F.3d 849, 858 (11th Cir. 2009) (explaining that *force majeure* clauses are enforceable, unlike illusory opt-out provisions, because they are triggered only by events "beyond the control" of either party (quotation marks omitted)).

"clearly and unequivocally abandon" the Children.  *Lopez v. Bamaca*, 455 F. Supp. 3d 76, 84 (D. Del. 2020) (citation omitted); *see also Friedrich*, 78 F.3d at 1066 ("Once it determines that the parent exercised custody rights in any manner, the court should stop — completely avoiding the question whether the parent exercised the custody rights well or badly.  These matters go . . . beyond the subject matter jurisdiction of the federal courts." (alteration added; citing 42 U.S.C. § 11601(b)(4)); *Rodriguez v. Yanez*, 817 F.3d 466, 473 & n.13 (5th Cir. 2016) (collecting cases).

Therefore, Petitioner has established that Respondent's retention of the Children in the United States was wrongful under the Hague Convention.

### B.  Affirmative Defenses

Having determined that Petitioner establishes a *prima facie* case of wrongful retention, the Court proceeds to Respondent's affirmative defenses.   (*See* Ans. 22–23). [10]   Weighing the evidence, the Court concludes that Respondent has, on balance, established one affirmative defense as to G.B. but none as to A.B.

***Grave Risk of Harm.***  Under Article 13(b) of the Hague Convention, a court may decline to order a child's return if the respondent shows by clear and convincing evidence that doing so would pose a "grave risk" of "expos[ing] the child to physical or psychological harm or otherwise plac[ing] the child in an intolerable situation."  *Id.* (alterations added); *see also Crespo Rivero*, 2018 WL 7577757, at *2.  Respondent argues that the Children face a grave risk of harm from two sources: the "war in Israel"; and Petitioner, "due to his criminal activities, dealings with drugs,

---

[10] The Court's determination that Petitioner has established wrongful retention disposes of Respondent's affirmative defenses that the Petition fails to state a claim and that Respondent has not breached Petitioner's rights of custody — both challenge Petitioner's *prima facie* case.  (*See* Ans. 22).  Likewise, Respondent's defense that Petitioner consented or acquiesced to the Children's removal by executing the January 2023 Agreement fails for the same reason as her argument that keeping them in the United States longer than 60 days did not breach Petitioner's custody rights.  (*See id.* 22–23).

propensity to use violence, and threatening behavior[.]"  (Ans. 23 (alteration added)).

Turning first to whether Israel presents a grave risk of harm, Respondent advances a two-pronged argument — asserting that the entire country of Israel is too dangerous for the Children; and that the specific cities to which they would return pose their own distinct risks.  The Court addresses each in turn.

### i.  The Alleged Danger in Israel

The Court's review is limited to the evidence the parties submitted, which consists primarily of conflicting lay-witness testimony.  On the one hand, Respondent and two of her family members, Assayag and Rotem Amar, testified that Israel remains unsafe.  Respondent, relying on news reports and conversations with contacts in Israel, described Israel as being just as dangerous as when she removed the Children and referred to an ongoing "holocaust," warning that terrorists would be released into Israel due to a ceasefire.  Assayag described the windows of her residence in Yavnah, Israel shaking from bombs.  Amar reported seeing and hearing missiles in Tel Aviv, Israel and having to go to bomb shelters.  Both Assayag and Amar chose to stay in Israel after the October 7, 2023 attack and remained there at the time of the evidentiary hearing, despite living there with minor children.

On the other hand, Petitioner, who remains in Israel with his wife and other children, testified that life has largely returned to "normal" and there is "no danger," in part because Israel is able to intercept all incoming rockets.  Respondent supplemented her testimony with news articles depicting the war and U.S. Department of State travel advisories concerning Israel and Gaza.  (*See generally* Resp't's Ex. List, Ex. 8, Travel Advisories [ECF No. 65-7]).  Neither party

CASE NO. 24-24340-CIV-ALTONAGA/Reid

submitted expert testimony regarding the current conditions in Israel, or in Dimona or Holon.[11]

Respondent's evidence falls well short of the clear and convincing standard required to establish a grave of risk of harm across all of Israel.[12]  True, courts recognize that returning a child "to a zone of war, famine, or disease" may satisfy the grave-risk-of-harm defense.  *Tereshchenko v. Karimi*, 102 F.4th 111, 129 (2d Cir. 2024) (citation and quotation marks omitted).  Yet, the Court is unaware of any decision holding that an entire country — rather than specific war-affected areas — poses a grave risk of harm to children.  *See id.* at 129–31 (departing from the norm of city-by-city analysis in finding the entire Western region of Ukraine posed a grave risk of harm to two children).

A finding that an entire country is too dangerous for children would, in effect, suggest that every child should be evacuated from that country.  The Court sees no basis for such a conclusion here.  Indeed, even the U.S. Department of State's travel advisories Respondent submitted only recommend "reconsider[ing]" travel to Israel generally.  (Resp't's Ex. List, Ex. 8, Travel Advisories 2).  By contrast, the State Department's more severe "Do Not Travel" warnings apply only to Gaza and specific areas near the Lebanese and Syrian borders — not to Israel as a whole. (*Id.*); *see also Tereshchenko*, 102 F.4th at 131 (citing a U.S. Department of State travel advisory that warned U.S. citizens "not [to] travel to Ukraine due to active armed conflict" (alteration added;

---

[11] Courts customarily consider expert testimony in assessing whether conditions in a child's country or region of habitual residence pose a grave risk of harm to the child.  *See, e.g.*, *Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1365 (M.D. Fla. 2002); *Freier v. Freier*, 969 F. Supp. 436, 443 (E.D. Mich. 1996); *Chung Chui Wan v. Debolt*, No. 20-cv-3233, 2021 WL 1733500, at *10 (C.D. Ill. May 3, 2021); *Salguero v. Argueta*, 256 F. Supp. 3d 630, 640 (E.D.N.C. 2017).

[12] Even if Respondent's testimony and the news articles she submitted were admissible — which is unlikely, given hearsay and foundational issues — her submissions would be insufficient to establish the defense.

citation and quotation marks omitted)).

Respondent's evidence is even weaker regarding the specific areas of Israel to which the Children would return — the cities of Dimona and Holon. Petitioner testified that neither of these cities is near the Gaza strip or the Lebanese or Syrian borders. Other than alluding to "murders" in Holon, Respondent made no showing that either city is more dangerous than Israel as a whole. Without such a showing, the Court cannot conclude that returning the Children to these specific locations — or Israel generally — poses a grave risk of harm to the Children.

*ii.  The Alleged Danger Posed by Petitioner*

Respondent also argues that Petitioner poses a grave risk of harm to the Children based on violent episodes and past criminal activity. Respondent, Assayag, and G.B.'s testimony touched on Petitioner's violent conduct and threats, and photographs depicted injuries to Respondent and property damage. Yet, neither Respondent nor the Children testified that Petitioner had physically harmed the Children or threatened to do so.

While "sufficiently serious threats to a parent can pose a grave risk of harm to a child[,]" *Gomez v. Fuenmayor*, 812 F.3d 1005, 1014 (11th Cir. 2016) (alteration added), this is not such a case. Ultimately — considering Respondent's statement that she did not believe Petitioner would "do something to [harm] the [Children]" — the verbal threats that Petitioner made to Respondent and others, the incidents of vandalism, and the physical abuse of Respondent and Assayag do not amount to clear and convincing evidence that Petitioner poses a grave risk of harm to the Children. *See Da Silva v. Vieira*, No. 6:20-cv-1301, 2020 WL 5652710, at *6 (M.D. Fla. Sept. 23, 2020) (finding that evidence of a grave risk of harm to the parties' child was lacking despite the petitioner having assaulted the respondent); *c.f. Gomez*, 812 F.3d at 1014–15 (determining that the petitioner posed a grave risk of harm to the parties' child when the petitioner, after threatening to kill the

respondent, had shot the respondent's girlfriend three times through the tinted windows of a car in which the child had been present only minutes earlier).

Respondent's argument regarding grave risk of harm is that Petitioner poses only an indirect risk to the Children — that his alleged ongoing criminal activities make him a target for violence, which could, in turn, place the Children in harm's way. This argument is unpersuasive. Respondent offered *no* evidence — aside from her own vague statements — to substantiate that Petitioner remains engaged in criminal conduct. She also did not reference any specific threats against Petitioner — only remarking generally that "people want to murder him."

Moreover, Respondent's own actions undermine her argument. She previously complained that Petitioner did not spend *enough* time with the Children, and between 2020 and 2023, she left them in his care several times and for extended periods while she visited the United States. Given these inconsistencies, Respondent fails to show by clear and convincing evidence that Petitioner poses a grave risk of harm to the Children, and this defense fails.

***Violation of Fundamental Principles.*** Respondent next invokes Article 20 to the Hague Convention, which allows the Court to deny the Children's return if returning them would be inconsistent with "fundamental principles of the [United States] relating to the protection of human rights and fundamental freedoms." *Id.* This defense requires proof by clear and convincing evidence. *See Sabogal v. Velarde*, 106 F. Supp. 3d 689, 699 (D. Md. 2015) (citation omitted). It applies only in "the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process." *Id.* at 711 (quotation marks omitted; quoting U.S. Dep't of State, *Hague Int'l Child Abduction Convention; Text & Legal Analysis* (Mar. 25, 1986), 51 Fed. Reg. 10,494, 10,510). This is an "extremely high standard." *Id.* In fact, "it appears that

no American court has ever applied this exception." *Id.*

Because Respondent's Article 20 arguments mirror her grave-risk-of-harm claims, she does not come close to meeting the extraordinarily high evidentiary threshold this defense demands.

***Mature-Child Exception.***   Finally, Respondent invokes the mature-child exception, arguing that the Court should deny the Petition "because both A.B. and G.B. object to being returned to Israel" and have "attained an age and degree of maturity at which it is appropriate to take account of their views[.]"  (Ans. 23 (alteration added)); *see also* Hague Convention, Art. 13. Petitioner insists that the Children express mere preferences, rather than firm, particularized objections; and that their testimony stems from Respondent's undue influence and their prolonged absence from Israel.  (*See* Pet'r's Mem. 7.)  He also argues that the exception is typically applied to older children, and that neither A.B. nor G.B. has shown sufficient maturity for her views to be determinative.  (*See id.* 5–6).

Under this exception, "a mature child's views on return can be 'conclusive.'"  *Custodio v. Samillan*, 842 F.3d 1084, 1091 (8th Cir. 2016) (quoting Elisa Pérez-Vera, Explanatory Report: Hague Convention on Private Int'l Law ¶ 30 (1981) ("Pérez-Vera Report"), available at https://assets.hcch.net/upload/expl28.pdf)).   The exception is "rooted in the autonomy of the wrongfully removed child.  The drafters of the Convention sought to deter wrongful removals, but they also recognized that wrongfully removed children are not inanimate objects — they are people with agency of their own."  *Rodriguez*, 817 F.3d at 475.

Courts rely primarily on three considerations in determining when this exception applies: "(1) whether the child is sufficiently mature; (2) whether the child has a particularized objection to being repatriated; and (3) whether the objection is the product of undue influence."  *Romero v.*

*Bahamonde*, 857 F. App'x 576, 583 (11th Cir. 2021) (citations omitted).  A stricter analytical standard applies when the child's wishes "are the sole reason underlying a repatriation decision and not part of some broader analysis." *de Silva v. Pitts*, 481 F.3d 1279, 1286 (10th Cir. 2007) (citation omitted).

### i. *Maturity Analysis*

In assessing maturity, courts "have looked to the child's age, ability to express mixed feelings, and to plan past obstacles[.]" *Bahamonde*, 857 F. App'x at 583 (alteration added; citation omitted).  An "ability to provide detailed answers demonstrating an understanding of [the child's] situation" can be persuasive. *Id.* So, too, can an indication that the child understands the difference between a truth and a lie, or that the child has sufficient memories of the country of her habitual residence as to allow a "realistic comparison" between the two countries, be persuasive. *Matovski v. Matovski*, No. 06-4259-Civ, 2007 WL 2600862, at *14 (S.D.N.Y. Aug. 31, 2007).

Petitioner correctly notes that courts most often apply the mature-child exception to children over the age of 12.  (*See* Pet'r's Mem. 5 (citing Fed. Jud. Ctr., J. Garbolino, The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges 160 (3d ed. 2023))).   Yet, the Hague Convention sets no minimum age, and courts have found children as young as eight sufficiently mature. *See, e.g.*, *de Silva*, 481 F.3d at 1286–87 (citations omitted); *Anderson v. Acree*, 250 F. Supp. 2d 876, 883 (S.D. Ohio 2002) (eight-year-old); *Mendez Lynch*, 220 F. Supp. 2d at 1362 (nine-year-old); *Watson v. Watson*, No. 22-cv-2613, 2023 WL 1967587, at *8 (M.D. Fla. Feb. 13, 2023) (ten-year-old).

Nor is expert testimony required, although it is helpful.  *See Anderson*, 250 F. Supp 2d at 883–84 (applying the mature-child exception based on the court's direct observations of the child in chambers as well as other non-expert testimony); *Watson*, 2023 WL 1967587, at *8 (finding the

exception applicable based on *in camera* interviews of two children).   Ultimately, with no objective test for maturity, the determination hinges on the "*impression* a child left on the court through her testimony, demeanor, and mannerisms." *Valles Rubio v. Veintimilla Castro*, No. 19-cv-2524, 2019 WL 5189011, at \*19 (E.D.N.Y. Oct. 15, 2019) (emphasis in original), *aff'd*, 813 F. App'x 619 (2d Cir. 2020).  The Second Circuit has observed that the standard should be relatively demanding. *See Blondin v. Dubois*, 238 F.3d 153, 166 (2d Cir. 2001), *abrogated on other grounds by Golan v. Saada*, 596 U.S. 666 (2022).  Still, a trial court's assessment is due "great deference" — particularly when based on in-person observations of the child. *de Silva*, 481 F.3d at 1287.

The Court's *in camera* interviews of A.B. and G.B. — guided by questions submitted by the parties — along with the parties' testimony about the Children, informs the Court's maturity determination.  Both A.B. and G.B. indicated they understood the importance of testifying truthfully and provided thoughtful, detailed answers to the Court's questions.

To varying degrees, the Children also appeared to have sufficient memories of their lives in Israel to allow a realistic basis of comparison.  The nine-year-old A.B. acknowledged she did not remember Israel "very well" but recounted specific memories involving friends, activities, and family — including some positive recollections of both Israel and Petitioner.  A.B.'s testimony contradicts Petitioner's assertion that the Children "had nothing positive to say about their entire lives in Israel." (Pet'r's Mem. 2).  Eight-year-old G.B., for her part, stated she remembered her life in Israel, readily recalled details from that period, and described enjoying her Israeli school's academics.

At bottom, the Court is left with the impression that both Children had a genuine grasp of their situation and could make a realistic comparison of life in Israel with life in the United States.

*ii. Undue Influence*

Petitioner argues the Court should disregard the Children's testimony as the product of undue influence. (*See* Pet'r's Mem. 7 (citing *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 279 (3d Cir. 2007); other citation omitted)). He claims Respondent has "brainwashed" the Children, who are "legitimately afraid" of her (Pet., Ex. 6, [WhatsApp] [M]essages . . . 2); and that during video calls, the Children appeared to look away from the camera toward Respondent, suggesting fear and an inability to speak freely. Petitioner also pointed to a particular moment in G.B.'s *in camera* testimony as evidence of her susceptibility to Respondent's influence — when G.B. recounted that she used to oblige her stepmother's request to call her "mom" but later stopped after Respondent became upset that she had done so.

The Court finds that evidence of undue influence is lacking. The Children's eye movements on video calls are not dispositive; distraction is just as plausible an explanation as fear, particularly because, according to G.B., some calls occurred while the Children were in the car on the way to school. Relatedly, both Children denied that Respondent coached their testimony, aside from advising them to tell the truth. Further, G.B.'s decision to stop calling her stepmother "mom" is indicative of maturity, not undue influence; G.B. testified that, as she got older, she felt it was inappropriate and made an independent decision to stop doing so.

Petitioner's argument that the Children's "views are the product of undue influence simply by virtue of the amount of time [they have] been kept from their family, friends, and life in Israel" is similarly unavailing. (Pet'r's Mem. 7 (citation omitted)). The Court is mindful that applying the mature-child exception when a child has grown attached to a new country due to wrongful retention could incentivize delay tactics. *See Garcia v. Pinelo*, 808 F.3d 1158, 1169 (7th Cir. 2015) (citation omitted). Nevertheless, dismissing the Children's views solely because of the time

lapse would render the mature-child exception a "'dead letter'" — a result the drafters of the Convention did not intend. *Alcala v. Hernandez*, 826 F.3d 161, 175 (4th Cir. 2016); (*see also* Resp't's Mem. 12).

### iii.  Particularized Objection v. Preference

Finding no evidence of undue influence, the Court now turns to whether A.B. and G.B. made particularized objections to repatriation.  A particularized objection requires a child to affirmatively object to return, not merely express a preference. *See Bahamonde*, 857 F. App'x at 583 (citing *Rodriguez*, 817 F.3d at 477).  The distinction between an objection and a preference turns on whether a child expresses that "living in either country would be acceptable" or that "living in [one] country would be unacceptable." *Rodriguez*, 817 F.3d at 477 (alteration added). The basis of the child's objection is irrelevant; "the Convention simply deemed it inappropriate to return a mature child 'against its will' — whatever the reason for the child's objection." *Id.* at 476 (quoting Pérez-Vera Report ¶ 30).

Eight-year-old G.B. unambiguously objected to returning to Israel, repeatedly stating she did not want to go back.  She described anxiety over the war, sirens, and bomb shelters, which made it difficult to sleep.  In contrast, she testified she felt safe in Hollywood.  That amounts to a particularized objection, satisfying the mature-child exception as to G.B.

Nine-year-old A.B. also testified that she did not wish to return to Israel.  She recalled feeling scared at times and going to bomb shelters and expressed a preference for staying in Hollywood, where she enjoyed school, had made friends, and felt safer.  Yet, her explanation for wanting to remain was simply, "it's more fun for me here."  Then, she added that Israel was "also fun."

Taken as a whole, A.B.'s testimony does not convey an unequivocal objection to living in

Israel but rather a preference for staying in Hollywood. Because the mature-child exception requires more than a general preference, A.B.'s statements are insufficient to meet the standard for a particularized objection. *See Tsai-Yi Yang*, 499 F.3d at 278 (noting the exception must be "construed narrowly so [its] application does not undermine the express purposes of the Convention" (alteration added; citation and quotation marks omitted)).

### C. The Hague Convention's Preference for Return

Having found that Petitioner has established a *prima facie* case of wrongful retention, and that Respondent narrowly establishes the mature-child exception for G.B. but not A.B., the Court must determine the appropriate remedy. The Hague Convention neither mandates nor prohibits denying return for all siblings when an exception applies to only one. *See generally id.* Respondent urges the Court to deny the Petition in full, arguing that separating A.B. and G.B. from their younger twin half-sisters would cause the Children "severe psychological distress" and result in an "intolerable situation within the meaning of the Convention." (Resp't's Mem. 9 (citations and quotation marks omitted)). Alternatively, and rather inconsistently, Respondent asks the Court to grant the Petition in part and order the return of only one child. (*See id.* 10). Based on a careful review of the Convention and applicable case law, the Court determines that both Children must be returned.

The Convention's purpose strongly favors return. Its "core premise is that 'the interests of children . . . in matters relating to their custody' are best served when custody decisions are made in the child[ren]'s country of 'habitual residence.'" *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) (alteration in original; quoting Hague Convention, Preamble; other citation omitted). The Convention's structure reinforces this principle: returning a wrongfully retained child is generally mandatory "[a]bsent a finding that an exception applies," *Golan*, 596 U.S. at 672 (alteration added;

citation omitted); while retaining a child under an exception is always discretionary, *see* Hague Convention, Art. 18.  Courts narrowly construe exceptions "lest their application undermine[]" the Convention's core premise.  *Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995) (alteration added).

Respondent argues that the Hague Convention also prioritizes preserving sibling bonds. (Resp't Mem. 9 (alterations added)).  According to Respondent, this principle has led courts to "consistently . . . den[y] petitions in full, declining to order the return of any children, even where an affirmative defense is established as to only one of the siblings."  (Resp't Mem. 8 (alterations added; citations and emphasis omitted)).  Yet, Respondent offers only one example to support this sweeping assertion.  (*See id.* (citing *Ermini v. Vittori*, No. 12-cv-6100, 2013 WL 1703590, at *17 (S.D.N.Y. Apr. 19, 2013) ("Courts in this Circuit have frequently declined to separate siblings, finding that the sibling relationship should be protected even if only one of the children can properly raise an affirmative defense under the Hague Convention." (citations omitted)), *aff'd as amended*, 758 F.3d 153 (2d Cir. 2014)).[13]  Unlike here, however, the petitioner in *Ermini* had subjected the children to a sustained pattern of violent abuse, implicating the grave-risk-of-harm defense.  *See* 758 F.3d at 164–65 (discussing the trial court's findings and holding the grave-risk-of-harm defense applied to all the abducted children).  The Court thus finds that the goal of

_____

[13] The other cases Respondent cites for this proposition do not involve courts declining to order return on the lone basis of protecting sibling bonds.  (*See* Resp't Mem. 8–9).  In one, a petitioner had not established a *prima facie* case.  *See Leonard v. Lentz*, 297 F. Supp. 3d 874, 890 (N.D. Iowa 2017).  In others, affirmative defenses applied to all the children who had been wrongfully removed or retained.  *See Lomanto v. Agbelusi*, No. 22-cv-7349, 2023 WL 4118124, at *17 (S.D.N.Y. June 22, 2023) (well-settled defense as to both children; mature-child exception as to one); *Sadoun v. Guigui*, No. 16-cv-22349, 2016 WL 4444890, at *12 (S.D. Fla. Aug. 22, 2016) (grave-risk defense); *Miltiadous v. Tetervak*, 686 F. Supp. 2d 544, 557 (E.D. Pa. 2010) (same); *In the Marriage of S S & D K Bassi*, 17 Fam LR 571, ¶ 55 (1994) (Austl.) (same).

24

protecting sibling bonds is insufficient to overcome the Convention's strong preference for return.

Nor do principles of equity justify denying the Petition in full.  (*See* Resp't's Mem. 11).
The cases Respondent cites are inapposite, as they address courts weighing return only for children
individually subject to an established affirmative defense.  (*See id.*); *see also Alcala*, 826 F.3d at
174–75 (well-settled defense); *Yaman v. Yaman*, 730 F.3d 1, 21 (1st Cir. 2013) (same);
*Gwiazdowski v. Gwiazdowska*, No. 14-cv-1482, 2015 WL 1514436, at *5 (E.D.N.Y. Apr. 3, 2015)
(same); *In re D.T.J.*, 956 F. Supp. 2d 523, 547 (S.D.N.Y. 2013) (well-settled defense; grave-risk
defense; and mature-child exception).  Respondent cannot override the Convention's core
principle by "invoking a free-floating notion of equity."  *Haymount Urgent Care PC v. GoFund
Advance, LLC*, 738 F. Supp. 3d 426, 452 (S.D.N.Y. 2024).

Given that Respondent has not demonstrated a grave risk of harm — and that eight-year-
old G.B.'s qualification for the mature-child exception is a close call — the Convention's strong
preference for return controls.  *See de Silva*, 481 F.3d at 1286 (citation omitted) (describing the
caution that a court must exercise in considering whether the mature-child exception, standing
alone, warrants denying a petition).  The Court therefore declines to deny the Petition outright.

Finally, the Court agrees it should not "wield[] the Convention like King Solomon's
sword" and separate A.B. and G.B.  (Pet'r's Mem. 9 (alteration added)).  Again, Respondent's
request that the Court do so is at odds with her argument that separating the Children "would
directly contradict the fundamental purposes of the Convention."  (Resp.'s Mem. 6; *see also id.*
10).  Rather than advancing the Hague Convention's aim of "restor[ing] the pre-abduction status
quo[,]" *Lops*, 140 F.3d at 936 (alterations added; citations and quotation marks omitted), such a
decision would inflict "traumatic and destabilizing" harm due to the Children's "fundamental
emotional reliance on one another" (Resp't's Mem. 9).  It would also amount to a *de facto* custody

CASE NO. 24-24340-CIV-ALTONAGA/Reid

determination — an issue beyond the Court's jurisdiction.  *See Friedrich*, 78 F.3d at 1063–64 (citations omitted).  Accordingly, the Court concludes that the more appropriate result is to grant the Petition in full.

### IV.    CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1.  Petitioner, Israel Bassat's Verified Petition for Return of Child[ren] **[ECF No. 1]** is **GRANTED**.

2.  Respondent shall ensure that A.B. and G.B. travel to Israel on a flight departing on or before **April 3, 2025**, accompanied by an appropriate caregiver.

3.  On or before **March 17, 2025**, Respondent shall file a notice advising the Court of the logistical details of the Children's return travel to Israel, including the timing of the travel and the name of the caregiver accompanying them.

4.  The Clerk of Court is **DIRECTED** to release the Children's Israeli passports to Petitioner's counsel; and release Respondent, Sapir Swissa Dana's Israeli passport to Respondent.

5.  Respondent shall not remove the Children from the Southern District of Florida other than to return them to Israel.

6.  The Court retains jurisdiction as necessary to ensure compliance with this Order.

**DONE AND ORDERED** in Miami, Florida, this 7th day of March, 2025.

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

26